The Judges delivered their opinions. *
Judge Green.
The first enquiry in this case is, whether the appellant has shewn himself to be entitled to the rights of David Duncan, of Pittsburg, in the subject in question, so as to be entitled to assert them against the appellees, who claim under Welch. He asserts, that David Duncan made his will, whereby he directed all his property, real and personal, to be sold by his executors: that, he purchased the land in question of George Wallace and Abraham Kirkpatrick, two of his executors: that, Samuel, David, Hannah, Mary, and Margaret Duncan, arc the heirs of David Duncan; and it appears, from the paper exhibited as a copy of the will, that they are also his sole devisees, of the proceeds of the sale of the land in question. Due publication has been made as to those heirs and devisees, and George Wallace is dead, and the suit has abated as to him. Kirkpatrick answered, and admitted all the allegations of the bill. Some of the defendants claiming under Welch, do not deny these allegations. Others, saying they know nothing about them, call for proof; and others' are infants, answering by guardian, and neither admitting nor denying those allegations. The appellant, in proof of those allegations, exhibits a paper, purporting to be a copy *216 of the will of David Duncan, recorded in Alleghany county, in Pennsylvania, certified by the Register of that county. But, from this, it does not appear, upon what Pro°f the will was admitted to record. He also exhibits a contract between the said Duncan and David Steel, who conveyed the lands in question for David Duncan, and various other documents in relation to the said lands, which he alledges, were delivered to him by the executors of D. Duncan, and which Kirkpatrick also alledges. These papers could have been had no where, but from the representatives of David Duncan; also a paper purporting to be a copy of the proceedings and judgment in the name of David Steel against Margaret Duncan, executrix, and Abraham Kirkpatrick and George Wallace, executors of D. Duncan, deceased. This paper is certified by the Prothonatory of Alleghany county, in Pennsylvania, under his seal of office; but, it is not otherwise authenticated, so as to be strictly legal proof. Is this proof sufficient to establish the facts alledged by the appellant, upon which he founds his title as against the representatives of David Duncan ? And, if so, is it sufficient also against the other appellees, claiming under Welch ?
The act authorising proceedings in Chancery against absent defendants, prescribes, that after due publication: “If such absent defendants shall not appear1 and give such security, within the time limited, or such further time as the Court shall allow, upon good cause shewn, the Court may proceed to take such proof as the complainant shall offer; and, if they shall thereupon be satisfied of the justice of the demand, they may order the bill to be taken for confessed, and make such order and decree therein, as shall appear to be just, &e.” This act passed as to absent debtors, originally in 1777, and was extended to other absent defendants in .1787; and it was not until 1792, that any mode was prescribed for giving notice to an absent defendant, whose residence was not known. From this, it appears, that “ such proof as the .complainant shall offer,” *217 spoken of in the act. of 1777, was not confined to strict legal proof; for if it was, then, in consequence of the absence of the defendant, and his place of residence not being known, it would, in many cases, be impossible for the plaintiff to produce any such legal proof. His evidence might consist of the testimony of witnesses exclusively, and their testimony could not be strict legal proof, unless taken upon notice to the other party. The act of 1792, therefore, related, not to proceedings against originally absent defendants, proceeded against by publication under the acts of 1777 and 1787; but, to absent defendants, properly before the Court, upon process duly served, or by answer. Such proof as the act of 1777 alludes to, was not taken as the foundation of the decree; but, only to satisfy the Court, that, under all the circumstances of the ease, the demand was just, and' might be other than strict legal proof; and, being so satisfied, the Court was authorised then, and then only, “to order the bill to be taken for confessed,77 which was not the necessary consequence of the non-appearance of the defendant; and, thereupon, the decree was founded, not. on the proof, but upon the ad mission of the bill in omnibus.
The inchoate right, which David Duncan had, at the lime of his death, to the lands in question, was real, and not personal estate; and, if he had died intestate, would have descended to his heirs at law, and would not have passed to his personal representative. This interest could only have been devised by a will executed in the manner prescribed by the laws of Virginia for a will of lands ; and, although it be not necessary to prove a will in a Court, of Probate in Virginia, for the purpose of giving it effect as a will of lands, yet, it is necessary, when the fact is in issue, that he who claims under it should shew by proof in the cause, in which the claim is asserted, that it was executed with the solemnities required by the laws of Virginia, to give it the effect of a will of lands. This fact may be shewn, by producing a proper probate in a Court *218 of Probate in Virginia; or, if the will has not been so proved, by any other competent evidence, according to the course of the common law. These points are fully discussec^ ™ the case of Bagwell v. Elliott, ante. If, therefore, in this case it was incumbent on the appellant to produce strict proof of the execution of the will, as a will of lands, in Virginia, according to the laws of Virginia, he would totally fail; for, in strictness, there is no legal proof of the existence of the will, or of the manner of its execution. But, according to the view I have taken of our statutes, no such strict legal proof was necessary in this case, as to the absent defendants; and, I think, that the proofs exhibited were sufficient to satisfy the Court, of the justice of the plaintiff’s demand, and to justify the taking of the bill as confessed, and decreeing accordingly. The allegation of the plaintiff, admitted by the surviving executor, and proved by the production of papers, in relation to Duncan’s title, (which could not have been had but from Duncan’s representatives,) that he purchased from the executors, authorised by the will to sell the land; the act of the executors in taking upon them to sell; and the acquiescence of the heirs and devisees of Duncan in that sale, ever since 1806; are circumstances, which, in this suit, as against absent defendants, justify the belief, that the will was duly executed to pass lands, according to the laws of Virginia; and that the executors sold the lands in question to the plaintiff. ' If the will had only authorised the executors to sell, it would have been necessary that all should join in the sale, in order to effect a valid sale; unless those who sold had previously qualified as executors in Virginia. But, the will authorises any two to act, and any two were authorised to make a valid sale, by force of the will, without any qualification as executors; the act of 1785, ch. 61, § 42, being an enabling, and not a prohibitory, statute. The act of 1777 seems to have adopted the act of 5 George 2d, ch. 25, authorising bills to be taken pro confesso after publication, in certain cases, *219 with this difference, that, under the English statute, the bill was taken pro confesso of course, and the decree aceordingly followed, without any proof to satisfy the Court of the justice of the demand, either before or after the order for taking the bill pro confesso. The reason which induced the Legislature of Virginia to deviate, in this respect, from the provisions of the English statute, seems to be, that our act authorises publication against any absent defendant, who might never have heard of the demand; the English statute only authorises publication against defendants who had left the kingdom, or absconded and concealed themselves, to avoid the service of process in that very cause.
The right of the appellant to the interest of David Duncan in the lands in question, being thus established, as against the heirs, devisees and executors of David Duncan, is sufficiently established against the appellees claiming under Welch; for, the only interest they can possibly have in that question is, that the decree in this cause shall exempt them from any new litigation with those heirs, devisees, or executors, in another suit. The decree in this cause, if in favor of the appellant, will have that effect, as it would be a complete bar to any new suit on their behalf; their only relief being, by setting aside the decree within seven years, as -the statute prescribes. And if the heirs, devisees and executors of David Duncan had actually appeared and answered, admitting the case stated by the plaintiff; or, if all of them had been plaintiffs with Morrison, and had stated the case which he has stated, such admissions would have been binding, and the defendants claiming under Welch could not have controverted the fact, that Morrison had legally acquired David Duncan’s rights. The legal proceedings which establish that, fact against the heirs, devisees and executors of David Duncan, ought to have the same effect as their admissions of record, by bill or answer, would have.
*220 We come, then, to the merits of the case. No one can read this record, without being convinced that David Duncan, of Pittsburg, was the real owner of the surveys, upon which the patents for the land in question issued; that he never parted with his right; and that the assignment to Welch, under which the appellees claim, was in effect a forgery.
It is not necessary to comment at large, upon the great mass of authorities cited in the argument of this case. It appears from those cases, and others not cited, that the favor shewn by a Court of Equity, to a purchaser for valuable consideration without notice, is founded on the rule, that where the equity is equal, the law shall prevail. Thus, a Court of Equity will not assist an equitable title, against a purchaser of the legal title for valuable consideration, without' notice of the equity; for, both parties have equal equity. And, a purchaser for valuable consideration from one in possession, and having some interest in the subject of the sale, without notice of a prior equity, (whether the vendor professed to sell the legal title, or only an equitable interest,) may protect himself effectually by procuring, by any means, the legal title, after notice of the prior equity. And, that, because his equity originally acquired by the purchase is equal to the prior equity; and so, even if the purchaser has in such case acquired, not the legal title, but only a better right to call for the legal title. And, although the rule is, that where equity is equal and neither party has the legal title, nor a better right than the other, to call for it, qui prior est tempore, potior est jure; yet he who asserts such prior equity, or- even a legal title, must establish his case without the assistance of the other party; for, a Court of Equity will not, in such case, compel a discovery. Thus far the cases have unquestionably gone, and one case has even gone further. The legal title being in a trustee, the owner of the equitable title devised it; but his heir at law entered into possession, *221 and sold to a purchaser for valuable consideration, without notice of the will. The trustee refused to assert his legal title, for the benefit of the devisee, and the latter applied to a Court of Equity for relief, which was refused. But, a case contradicting this, is reported in 18 Vin. Abr. tit. Purchaser, C. pl. 15. A. mortgaged land to B. and afterwards, by his will, (having two sons, C. and D.) devised the equity of redemption to D. B. and C. join in an assignment of the mortgage to E. who pleaded want of notice of the will, and that C. was the visible heir; yet decreed, that D. should have the equity of redemption, on the foot of the first mortgage. The first of these cases was determined upon the principle, that the testator, having the equitable right, which, hut for the will, would have descended to his heir at law, the purchaser from the heir at law in possession, without notice of the will, thereby acquired an equal equity with that of the devisee; in like manner as if the testator himself had, instead of devising, conveyed the equity and afterwards sold to the purchaser without notice of the former conveyance; the heir at law completely substituting the testator. The other case denied that the purchaser from the heir without notice of the will, had thereby acquired any equity, or an equal equity with the devisee; the heir never, in fact, having-had any interest in the subject, by the purchase of which, the purchaser could acquire any equity. The utmost extent to which the cases have gone, is, that he who purchases of one in possession, having some interest in the subject, or who, or whose ancestors once had an interest in the subject, which, hut for the secret title not known to the purchaser, would have passed to him, thereby acquires an equity which may be protected by the acquisition of the legal title in any way. But, no case has yet occurred, in which it has been decided, that a purchaser without notice, from a mere stranger, who never had, aud whose ancestors never had, any interest whatsoever in the property, gave any equity whatsoever to the purchaser.
*222 The ease of the bank stock transferred upon a forged power of attorney, in which Lord Hardwicke gave relief against the transferee, was decided upon general princiP^es °f laW and equity. The subsequent case, in which relief was given in favor of the owner against the bank, proceeded upon the ground, that the rules of the bank had bound the bank to make good the loss, and their negligence in permitting the assignment, without the proof a3 to the authenticity of the power of attorney, which their own rules required. If the bank had not been so responsible, no doubt but the purchaser, although he had acquired the legal title, without actual fraud on his part, would • have been, according to Lord Hardwicke’s decision. The true owner could not, in any event, have lost his property by the forgery. The purchaser would be bound to en-quire as to the right and authority.of the person with whom he dealt, to transfer the property belonging to another, and would have borne the consequences of his gross negligence in that respect, if the bank had not taken upon themselves that duty and responsibility. Gross negligence is, in equity, equivalent in its effects, to fraud or notice. Ignorance as to the identity of the person with whom the party deals, or of the authenticity of the title papers under which he purchases, proceeds in all cases from gross negli- • gence; for, the facts in respect to those circumstances could be ascertained with reasonable diligence, in all cases. A purchaser ought to be required to look to these points at least, at his own peril. Meade v. Young, 4 T. R. 28.
In the case at bar, the papers under which Hicks and . Campbell and the Curries purchased, shewed, that the original entries and surveys belonged to David Duncan, and it was his equitable or inchoate right to the land, which they designed to purchase. . They had full notice of his title. With reasonable diligence they might have ascertained who was the real owner of the property, and whether the assignment to Welch was genuine or a forgery. They purchased without any such enquiry, and were *223 guilty of gross negligence. Neither Welch, nor any claiming under him, acquired by their respective purchases, any equity whatever, to be set up in opposition to that of David Duncan and those claiming under him. None of them purchased a legal title. Their rights, in equity, must be determined according to the state of things at the time of the purchase, and cannot be varied by the subsequent acquisition of the legal title, without any further valuable consideration. If the appellees claiming under Welch could succeed in this case, then, upon the same principles, if one mortgaged his land, and another, personating him, sold the land for valuable consideration to one who believed that he was dealing with the true owner, and the purchaser afterwards purchased the mortgage and thus acquired the legal title, the true owner could not redeem, but would lose his estate forever, without remedy.
In equity, he who has acquired the legal title to the prejudice of another who has the better equitable right, is a trustee for the latter.
David Duncan’s rights were never forfeited in fact to the Commonwealth. The surveys were returned and the patent issued in due time; and the patentees, who, by taking out the patent, made it impossible for those claiming under David Duncan, to derive any benefit from a return of other copies of the surveys to the Register’s office, (for, they could not, if that had been done, have gotten patents,) cannot repel the claims of the appellant, upon the ground, that if they had not taken out the patents, David Duncan’s rights might, or would have been forfeited. As soon as they took out the patents, they were trustees for those claiming under David Duncan; and the rights of the parties could not be varied by the failure of those representatives to do an absolutely fruitless and vain thing, that is, to return the surveys again to the office.
Neither does the plea, that the plaintiff was a purchaser of a pretensed title, avail the defendants. It is not necessary to investigate the general doctrines upon that subject *224 in this case; since, whatever they may be, they do notap» pjy jn the present instance. The right of D. Duncan’s representatives was equitable and not legal There can be n0 disseisin of an equity; 1 Meriv. 357 Nor any possession adverse to an equitable estate, unless it be at the same time adverse to the legal estate, upon which the equitable estate depends. Ibid. If another had disseised the patentee, the possession of the disseisor would have been adverse., both to the patentees and the representatives of D. Duncan. But, the patentees having obtained the legal title, to which those representatives were in equity entitled, were trustees for them, and they might make a valid transfer of their equitable right.
The decree should, therefore, be reversed, and the holders of the legal title of the lands in question, declared to be trustees for the plaintiff, and decreed to convey to him, upon his paying to them respectively, such sums as they have expended in taking out the patents, and in the payjnent of taxes on the lands.
Judge Coalter.
On the merits-of this case, I think the decree is erroneous and must be reversed.
At the time the appellees made their purchase, the legal title of the lands was in the Commonwealth; and the equitable right, under the entries and surveys, was in the heirs of Duncan, who procured those entries and surveys to be made. And, although the appellees, or those under whom they claim, have since acquired the legal title from the Commonwealth, by virtue of the fraudulent or forged . assignment, (relied upon and exhibited with the answer, and procured by Welch, under whom they claim,) they never had any transfer from Duncan, the true owner, of his equitable rights, binding on him and his heirs. A legal title, acquired under such circumstances, can be no bar . to the equity of Duncan, or those claiming under him, *225 any more than such title, if acquired by Welch himself, would he a bar to that equity. They can only stand in his shoes. They have no right to stand in the situation of a subsequent purchaser of an equity, who unites with that equity the legal title, before notice of a prior purchase. In that case, both parties acquire the rights of the owner, and each has a remedy against him. But, the parties in this case, presuming them to know the law, had notice that all was not regular on the part of Welch, and ought, therefore, to have enquired. The assignment made to Welch by the protended 'David Duncan, was of the entries, not of the surveys. This assignment was made after the surveys, at which time, as I understand the law, no one was entitled to copies of the surveys, except the true owner; and, as they are made assignable by law, this was doubtless intended, amongst other things, to prevent fraudulent assignments. But, every person is entitled to a copy of the entry. 2 Rev. Code, (new edit.) p. 368. Welch perpetrated the fraud, by procuring these, and an assignment of them, after they had been reduced to surveys, wiien the surveys themselves ought to have been assigned, in order to entitle the assignee to a patent. By this means, he, probably practised a fraud on the surveyor, who, perhaps, supposing him the owner, gave him copies of the plats. He also practised one on his assignees, and finally on the Register, who issued grants, although there was no actual assignment on the surveys, as the law requires. So, that if there was any doubt about my first position, I think the appellees, or those under whom some of them claim, were hound to notice this irregularity, and to take the consequences.
Warrants and surveys ate made, assignable by law, and where a patent issues to the assignee of a plat, the assignment is to he stated in the patent. 2 Rev. Code, p. 371 and 372. There is no law, that I can find, authorising an assignment of an entry. Such assignments, however, I believe, have been common, and held a good transfer of *226 the equitable title, so as to enable the assignee to make a survey in his own name. But, after the entry has been reduced to a survey, then the regular course is, for the Party to get a copy of his survey, and to assign it, the entry being now functus officio. 2 Rev. Code, 369. In regard to the survey, the act provides, that within three months after making the survey, the surveyor shall deliver to his employer or his order, a true plat and certificate of survey, who shall, within 12 months, return the same to the Register’s office, Ibid. p. 370; and that no surveyor shall, at any time within 12 months after the survey made, issue or deliver any certificate, copy or plat of land by him surveyed, except only to the person or persons for whom the same was surveyed, or to his, her or their order, unless a caveat shall have been entered, &c., to be proved by an authentic certificate of such caveat, &c. Ibid. p. 372.
It might seem, from this, that after 12 months, any person might get a copy of the survey; but, as various acts of Assembly, passed from time to time, extended the time of making returns of surveys to the Register’s office, I believe the sound construction of the act, and the practice of the surveyor under it, was, not to deliver copies of plats to any but the owners, so long as they had time to return the same, unless in case of caveat, as aforesaid. Be this, however, as it may, an assignment of the plat was necessary, in order to entitle the assignee .to a patent, which must recite the assignment as aforesaid.
As to the other points in this case, whether the appellant has sufficiently deduced his title from David Duncan, and the ground stated in the decree for dismissing the bill, I am of opinion, for the reasons stated by the Judge who has preceded me, that the decree cannot be supported on either of those grounds. It must, therefore, be reversed, and the decree entered which has been prepared.
Judge Brooke, concurred; and the following decree •was entered:
*227 The Court is of opinion, that the assignments under which James Welch claimed title to the surveys in the proceedings mentioned, made for David Duncan and David Duncan & Co., of Pittsburg, being made by one having no title thereto, neither the said Welch, nor his assignees, nor the assignees of his assignees, acquired by their respective purchases thereof, any equity which a Court of Equity ought to respect, when opposed to the rights of David Duncan, or of those claiming under him; and that the subsequent acquisition of the legal title, without further consideration paid by the said assignees, could not better their case; that, therefore, those to whom the patents issued, were, thereupon, in equity, trustees for those claiming under the said David Duncan, and cannot avail themselves of the omission of the rightful owner of the land, to assert his claim at an earlier period; and, that the objection, that the appellant was a purchaser of a pretensed title, is also unavailable to the appellees claiming under Welch; that the appellees, respectively, in whom the legal title to any of the lands in the proceedings mentioned is vested, should -be decreed to convey the same, with special warranty to the appellant, upon his paying to them, respectively, any sums of money which they may respectively have paid, for the costs of taking out the patents for those lands, or may have paid for taxes upon the same; the amount of which should be ascertained under the direction of the Court of Chancery; and that the said decree is erroneous, &c..

 Judge Cabell, did not sit in this cause.